## Southern New England Telephone Company *v.* Public Utilities Commission

Superior Court       Hartford County       File No. 160559

Memorandum filed June 24, 1970

*John Lashnits, John E. McNerney,* and *Robert S. Medvecky,* all of New Haven, for the plaintiff.

*Robert K. Killian,* attorney general, and *John K. Jepson* and *Frank R. Odlum,* assistant attorneys general, for the defendant.

DEVLIN, STATE REFEREE. The plaintiff company on November 18, 1968, filed with the defendant commission proposed amendments to the existing rate schedule which would increase the rates and charges for telephone service to all subscribers and would provide for an overall estimated increase in the company's gross revenues, based on the 1969 level of business, of approximately $23,900,000, or about 9.5

percent. These rates were to become effective on December 1, 1968. Hearings were held in December of 1968 and January and February of 1969. At these hearings the company presented five witnesses and a considerable number of exhibits. No evidence was offered by the commission or its staff. Under the procedure followed by the commission, members of the general public were permitted to state their positions with regard to the rate increase. The court adopted the same procedure on appeal and allowed those present who had filed appearances to argue their claims.

A decision was rendered on April 23, 1969, and it is from this decision that the present appeal results. The appeal is brought under General Statutes § 16-37, which prescribes specific standards of judicial review. It provides, in pertinent part, as follows: "The court, upon such appeal, shall review, upon the record so certified, the proceedings of the commission and examine the question of the legality of the order, authorization or decision appealed from and the propriety and expediency of such order, authorization or decision so far as said court has cognizance of such subject and shall proceed thereon in the same manner as upon complaints for equitable relief."

In this type of appeal, the function of the court is to determine from the record whether the facts found by the commission are supported by the record, whether they furnish justifiable reasons for the action of the commission, and whether it has acted illegally or has exceeded or abused its powers. *Wilson Point Property Owners Assn.* v. *Connecticut Light & Power Co.*, 145 Conn. 243, 252. The court does not try the case de novo and cannot substitute its discretion for that reposed in the commission. *Kram* v. *Public Utilities Commission*, 126 Conn. 543.

A regulatory body, such as the public utilities commission, must act strictly within its statutory authority, within constitutional limitations, and in a lawful manner. *Southern New England Telephone Co.* v. *Public Utilities Commission,* 144 Conn. 516, 523. At any hearing involving rates, the burden of proving that the rates requested are just and reasonable is on the public service company. General Statutes § 16-22.

Specific attack is made on certain findings of fact. Paragraph 1 of the finding states: "The test year for this rate case is the 12 months ended October 31, 1968." The claim is made that this is not a fact but a conclusion, reached without reason or even discussion as to the propriety, expediency or legality of such a conclusion.

Apparently in all five previous rate cases involving the company, the commission had employed a test year ending in the future, in recognition of the fact that rates are fixed for the future and should be related to facts and events which could reasonably be expected to exist in the immediate future. This would seem to be a commonsense approach, since a new schedule of rates applies prospectively. Rates are fixed for the future and not the past. *McCardle* v. *Indianapolis Water Co.,* 272 U.S. 400.

The company presented evidence on the basis of all financial and operating facts, some estimated for the year ending December 31, 1969, or, as an alternative, for the year 1968 adjusted for known and reasonably anticipated changes in revenues, expenses and investment to December 31, 1969. It appeared that certain large expenditures forecast for 1969 were not estimates but were known and fixed by statute or binding collective bargaining agreements. In this category were included a general wage increase for all nonmanagement em-

ployees, in the amount of $3,269,000, to become effective May 4, 1969; changes in the company's obligations under its pension plan, in the amount of $2,420,000, to become effective on July 1, 1969; and increases in the amount of social security taxes owed by the company, in the amount of $253,000, to become effective on January 1, 1969.

As a matter of fact these changes, with the exception of the pension plan, became effective before the new rates filed by the company became effective. The effect of setting the test year deadline at October 31, 1968, was to foreclose any consideration of these known fixed obligations. No reason is given for the adoption of the test year period, and there is authority that the adoption of a single year as an exclusive test or standard imposes upon the company an arbitrary restriction in contravention of the fourteenth amendment. *West Ohio Gas Co.* v. *Public Utilities Commission,* 294 U.S. 79. In that case there was evidence of actual revenue and expenses, unchallenged, for two succeeding years. The commission, however, refused to consider this in fixing the new rates. The court stated (p. 81): "We think the adoption of a single year as an exclusive test or standard imposed upon the company an arbitrary restriction in contravention of the Fourteenth Amendment and of 'the rudiments of fair play' made necessary thereby. . . . The earnings of the later years were exhibited in the record and told their own tale as to the possibilities of profit. To shut one's eyes to them altogether, to exclude them from the reckoning, is as much arbitrary action as to build a schedule upon guesswork with evidence available."

Where estimates for future expenses are involved, the element of speculation always presents a problem, and the commission is confronted with passing

upon the possibility or probability of their occurring. Another matter to be considered is whether the claimed changes will occur within a reasonable proximity of the test year. Since a test period is employed to show what the probable operating and financial condition of the company will be in the immediate future, in order that rates may be fixed which will compensate the company for all operating expenses and provide it with a fair return, the test year must be representative of the conditions which will prevail in the immediate future when the rates will be effective. This test period must be based on the most recent actual experience of the company, with adjustments made for all known changes affecting costs and revenues in the immediate future which are not conjectural; *Re Hampton Water Works Co.,* 71 P.U.R.3d 447; and which are not so remote in time that they might destroy the representative character of the test year. *Re United Gas Pipe Line Co.,* 55 P.U.R.3d 483. And this applies especially to wage increases and taxes which are not the result of speculation or surmise. *Bell Telephone Co.* v. *Public Service Commission,* 70 Nev. 25, 38.

In this case, where definite ascertainable expenses involving wage increases, tax increases, and pension commitments, all to become effective before July 1, 1969, were submitted in evidence, a failure to consider them presents a false picture with reference to the future earnings the company may expect. *Central Maine Power Co.* v. *Public Utilities Commission,* 153 Me. 228, 236; *Bell Telephone Co.* v. *Public Service Commission,* supra. In failing to take these matters into consideration the commission acted arbitrarily.

Paragraph 3 of the finding states: "Property held for future use has been excluded from the rate base because it does not meet the requirement of

dedication to public use." This is discussed in the finding and order, wherein the commission states: "The Company's intra-state rate base calculation includes $187,000 representing the cost of property held for future use. In response to a Commission request, the Company submitted a schedule of the units of property comprising this balance. A review of this schedule indicates that the units of property itemized therein do not represent property which has been dedicated to a public service as at the end of the test year. It has been our consistent position that 'Consistent with accepted legal principles, a utility is entitled to a return only on property actually dedicated to the public service.' There is no deduction when land or other property is purchased for possible future use. The fact is that plans can and do change, and on occasions contemplated dedication does not materialize." The "accepted legal principles" referred to are based upon a long-standing custom or practice "which has been part of the regulatory process since the beginning of regulation of public utility companies." The commission claims sanction for this is found in General Statutes § 16-23, wherein it is stated: "All regulations, practices and service prescribed by the commission shall be in force and prima facie reasonable . . . ."

The properties excluded are listed in an exhibit. The year of expected use for some is listed as 1970, for others, 1975. The effect of this finding is to rule as a matter of law that unless the property was in fact in use on the last day of the test year it would not be considered.

Generally speaking, property not employed in the public service should not be incorporated into the base to be used to compute the fair rate of return. It must be kept in mind, however, that whether utility property is used or useful for inclusion in the rate base is a factual determination rather than a

legal question. *Lake Superior District Power Co. v. Public Service Commission,* 235 Wis. 667. The norm or standard is set out in 73 C.J.S. 1017, Public Utilities, § 18, in the following language: "On the other hand, property or equipment provided or acquired in anticipation of reasonable future need should be allowed as part of the rate base even though wholly or partially unused at the time to which the inquiry relates. In determining whether excess plant capacity shall be included in the rate base, a utility must have some latitude with respect to plant enlargement undertaken to meet the requirement imposed on it to furnish service when and as demanded by the public, and, while the utility must bear the burden of an unreasonable extension of its plant and the risk that portions of it prudently acquired may become obsolete or not useful, it should not be penalized for failure exactly to anticipate future demands for service in a period of depression."

Courts in applying the principle as stated in Corpus Juris Secundum have emphasized the nature of the inquiry which must be made by a commission with respect to property held for future use. For example, in *Petition of New England Telephone & Telegraph Co.,* 115 Vt. 494, 506, the court said: "In making this determination it should consider whether the purchase of the property in question was made in pursuance of honest and reasonable business judgment in carrying out some definite plan, for example, or whether the expenditure was dishonest, wasteful or imprudent. The time within which it may reasonably be expected that the property will be used is, as we have indicated, very important in determining the question. The commission has made no findings on any of these essential facts in support of its conclusion that the property should be excluded in determining the rate base.

Thus, again, for the lack of such findings we are unable to determine whether the commission was correct in its ruling." And in *Baltimore Gas & Electric Co.* v. *McQuaid,* 220 Md. 373, 380, it was stated: "Such property may be included in the rate base if the regulatory body determines that its acquisition was reasonably necessary and its use may be anticipated with reasonable precision, or if, it has sometimes been held, the property is likely to be placed in service within the period for which the rates are fixed."

The broader effect of the commission's finding is clearly stated by the court in *Denver Union Stock Yard Co.* v. *United States,* 57 F.2d 735, 746: "By denying the petitioner a right to earn a return thereon, the Secretary [of Agriculture] has, as a practical matter, denied the petitioner the right to own them, for it is mathematically certain that, if the petitioner is not permitted to earn a return upon the value of such properties, it cannot afford to keep them. Some one must pay the taxes . . . , and some one must pay a return upon the investment therein. If the petitioner is not permitted to earn sufficient funds from the only business which it has, . . . it cannot own them . . . . The evidence is likewise undisputed that the petitioner has about, if not quite, reached the limit of its present facilities. . . . The directors of the petitioner undoubtedly realized that land must be acquired for expansion in the immediate future, and that such land must be adjacent to the present plant, and that the amount of such adjacent and vacant land was limited; the directors further realized that the petitioner had no power of eminent domain, and that, if they waited until the demand was absolute, they would be at the mercy of the owners . . . . To have waited . . . would be to saddle upon the patrons an extravagant and unnecessary load."

All of the land was acquired for growth and expansion. Most of it is either adjacent to or contiguous to the present property or facilities of the company. One of the properties listed in Hartford as required for a garage is already in use.

The federal power commission, in recognition of the problem, allows such inclusion if the utility proposes to use the property within ten years. Common sense would seem to indicate that with the growing scarcity of land available for utility purposes good business acumen or sagacity should not be penalized. Subsequent higher land costs would have to be passed on to the consumer.

No definite time limitation should be imposed, and each piece of property should be dealt with individually. But to say that property is not dedicated to public use unless it is in actual use within the cutoff period loses all sight of equitable principles. The problem and the answer have been very succinctly stated in *Latourneau* v. *Citizens Utilities Co.*, 125 Vt. 38, 44, in the following manner: "The rule followed by us in dealing with the question of property held for future use 'recognizes that business judgment must be employed to anticipate future needs and that this judgment cannot be arbitrarily interfered with.' The test generally applied is whether the time for using the property in question is so near that it may properly be held to have the quality of working capital. The question is one of fact to be determined by the Commission."

As pointed out in the brief, the incongruity of the ruling is apparent. If the company, on October 31, 1968, had property held for future use and that property was put into use on November 17, 1968, the day before the company filed its application for increased rates, it could not be considered in the rate

base even though it was actually dedicated to public use at the time of the first hearing before the commission.

In ruling as it did the commission failed to consider equitable principles, and its finding has no legal support.

Paragraph 4 of the finding states: "The Company receives sufficient working capital from advance billing and tax accruals to provide working capital without an allowance for such funds in its rate base." The basis for this conclusion is set out in the finding in the following language: "The Company is familiar with the practice of this Commission in deleting this item from the allowed rate base in previous decisions."

In addition to the amounts claimed for materials and supplies, inventory and prepaid accounts, the company had included a provision for cash and working funds in the amount of $2,190,000, of which $1,672,000, is considered the intrastate portion.

"Working capital," in the context of public utility rate regulations, has been defined as the " 'allowance for the sum which the Company *needs to supply from its own funds* for the purpose of enabling it to meet its current obligations as they arise and to operate economically and efficiently.' " *Alabama-Tennessee Natural Gas Co.* v. *Federal Power Commission,* 203 F.2d 494, 498. If investors must provide the funds for working capital, they are entitled to a return on these advances, and this is accomplished by including the working capital requirement in the rate base. If, however, working capital funds are available from other sources and relieve the investor of the necessity for providing them, no allowance in the rate base for capital is required. It is well recognized that this factor is an element of fair value to be considered for rate fixing purposes.

*Board of Public Utility Commissioners* v. *New York Telephone Co.,* 271 U.S. 23, 31–32. How the problem should be handled is succinctly stated in *Pittsburgh* v. *Pennsylvania Public Utility Commission,* 370 Pa. 305, 309: "Whether cash working capital should be allowed as an element in determining the fair value of a utility's used and useful property as a rate base, and if allowed, the extent of such allowance, depends upon the factual situation in each case. If the financial situation of an operating company shows that sufficient funds are readily available to bridge the gap between rendition of and payment for services, no cash working capital is required and none should be allowed by the Commission."

There was evidence that, since 1960, federal tax laws require the earlier payment of taxes to the government pursuant to its objective of collecting taxes currently. In 1960, excise taxes were payable several weeks after the month billed, but they now are payable currently. These changes have produced an average additional cash requirement of $1,800,000. In 1960, the company could pay as little as 35 percent of its estimated federal income tax liability in the current year without penalty. Now 80 percent must be paid in the current year. This earlier remittance requirement raises the average cash requirement by $11,200,000. Similar changes requiring speed up of payments in employee withholding and company and employee social security taxes require an additional $1,000,000 in cash.

The company submitted a "lag" study showing the elapsed time between collections and payments of operating expenses, income taxes, excise taxes and other taxes under present conditions and claims that this evidence was ignored by the commission. This was the only evidence submitted on this point, and there is nothing in the record to show that the commission gave any consideration to these facts.

The effect of the finding was to exclude the amount of $1,672,000, from the rate base. The record is lacking in any support for the conclusion reached by the commission, and in considering the question as a matter of law rather than as presenting a factual situation the commission acted illegally.

Paragraph 6 of the finding states: "The use of an accelerated method of computing depreciation for purpose of determining Federal Income tax liability results in a tax saving, not a tax deferment, particularly since SNETCO will maintain a growing plan for the foreseeable future." Paragraph 8 of the finding, so far as it applies to this particular claim, states: "The use by this Commission, for rate making purposes, of accelerated depreciations . . . is a reasonable exercise of this Commission's authority."

The company keeps its books under the uniform system of accounts adopted by the commission. It uses straight-line depreciation for book purposes and employs the same depreciation method for income tax purposes. Section 167 of the Internal Revenue Code of 1954 expressly grants to all taxpayers, regulated and unregulated, the right to compute their federal income tax on the basis of straight-line depreciation and the option of electing to use accelerated methods of tax depreciation. The company claims that its use of straight-line depreciation for both book and tax purposes was a lawful method which it was entitled to use, and that in rejecting that method the commission acted illegally, arbitrarily and in abuse of its discretion, especially since there was no evidence in the record to support its finding.

There was evidence before the commission that, prior to 1954, tax depreciation allowances generally were limited to the straight-line method, whereby the annual deduction was computed by spreading

the cost of the property evenly over its estimated useful life. In 1954, the Internal Revenue Code, in order to stimulate the modernization and expansion of capital investment, provided for accelerated depreciation. The House Ways and Means Committee was quite explicit on its legislative intent by saying: "The faster tax writeoff would increase available working capital and materially aid growing businesses in the financing of their expansion. For all segments of the American economy, liberalized depreciation policies should assist modernization and expansion of industrial capacity, with resulting economic growth, increased production, and a higher standard of living." H. R. Rep. No. 1337, 83d Cong., 2d Sess. (1954). It was admitted that in a growing industry, such as the telephone, where plants are added to every year, the amount credited for depreciation increases to an extent much greater than it would under the straight-line method, and the result is a faster return. That was one of the purposes of the change.

If the company had been using accelerated depreciation starting in 1954, the net accumulated tax savings attributable to intrastate operation would have amounted to $32,376,000, through October 31, 1968. If it had instituted such a tax saving program during the test year, the federal income taxes could have been reduced by $488,000.

This matter had been considered before when the company sought an increase in rates in 1961 (P.U.C. Docket No. 10054), and the commission at that time stated: "The fact is that alternate methods of computing depreciation for Federal Income Tax liabilities have been available since 1955. In common with other operating companies of the Bell System, this Company has not deemed it advisable to adopt any of such alternate methods. It argues that such

adoption would constitute tax deferral and not tax savings. While this matter of alternate methods of computing depreciation for tax purposes has been the subject of some controversy, most large Connecticut utilities have adopted such methods in order to reduce current Federal Income Tax liability. While the Company argues that this is only a tax deferral, the fact is that the Company has been engaged in [an] extensive construction program. Since there is no foreseeable termination of the Company's continuing plant expansion program, adoption of alternate methods of computing depreciation would have the practical effect of obtaining permanent Federal Income Tax savings. We point out that in this respect, the Company has not availed itself of a practical and acceptable method of reducing its current Federal Income Tax liability which would have the result of materially improving its level of earnings and the return derived from property dedicated to public service." And apparently now it is the only public utility in the state which has not availed itself of this method of computing depreciation.

The company contends that there are serious flaws in the acceleration; that it overlooks the fact that future income taxes will be larger because of lower depreciation deductions for tax purposes; that it could also be interpreted as overstating the rate base; that it tends to misstate current costs; and that the only way it can be accomplished equitably is through the adoption of normalization. This would be accomplished by charging the reduction in tax payments as a current cost and accumulating them in a valuation reserve, the balance in the reserve representing the cumulative net amount of deferred taxes. This is based on the theory that, in the later years of the property life, depreciation deductions would be smaller and taxes higher, and this reserve

would be drawn upon to meet these higher taxes. The assumption is that the use of accelerated depreciation produces a tax deferral rather than a true tax saving.

The basic difference is that under the accelerated concept the taxes saved are "flowed through" to the consumer in determining rates. Under normalization it results in the creation of a credit balance on the company's books which increases the amount of revenues required through rates to provide a reserve. Consequently rates must be higher. When depreciation is normalized, the ratepayers are charged not the actual income taxes paid but a hypothetical larger figure for the taxes computed as if depreciation were figured on a straight-line basis. The difference between the actual taxes paid and the larger hypothetical amount for taxes charged to the ratepayers is accumulated in a reserve or deferred tax account. Where flow-through is employed, the ratepayers reimburse the utility for federal income taxes actually paid. The utility does not accumulate capital funds which are, in effect, enforced contributions from consumers. Both methods furnish guides but neither furnishes an absolute formula for depreciation.

The company claims that there is no evidence in the record questioning the propriety of straight-line depreciation accounting or that such accounting was improvident, fraudulent or in abuse of its discretion. It claims that this was a management prerogative and not subject to any expertise knowledge on the part of the commission.

The decision as to the method to be used in determining depreciation in filing the federal income tax return and computing the tax is largely a matter for the company to determine. It may exercise its own judgment after carefully weighing the advantages

or disadvantages. That is a matter between the federal government and the company under the provisions of § 167 of the 1954 code. The commission, however, does exercise control over the amount which it will allow the utility for taxes for rate purposes, just as it does over any other annual allowance for expenses.

There is a basis in the evidence for a finding that anticipated additions to the company's plant are going to be of a continually increasing magnitude and that the termination of the current degree of growth is not in the foreseeable future. The adoption of normalization during a period of growth or stability would force the ratepayers to provide funds for a theoretical or hypothetical tax liability which might never become payable or to provide funds in advance of the time they are needed.

The commission was faced with the problem of projecting which plan would be more advantageous to the consumer in the long run, and its finding, in effect, that normalization was more speculative was one it could reasonably reach under the circumstances. No general issue of law is involved, only a discretionary choice between competing accounting, theories and competing economic guesses. To say that, under these circumstances, the use of the acceleration method of tax treatment will impose an undue burden on future ratepayers on the ground that the company will eventually reach a so-called "pay back" status on federal income taxes seems inconsistent.

There is authority that the failure of the company to use accelerated depreciation in computing its income tax expense constitutes an abuse of discretion which places an unfair burden upon its customers; *Re Bangor Hydro-Electric Co.*, 26 P.U.R.3d 489; that it is the method which accords with fact and is

just and equitable to consumer and utility; *Re Davenport Water Co.,* 76 P.U.R.3d 209; and that a true tax saving does result from the use of accelerated depreciations and will continue to result for at least as long as plant additions equal or exceed plant retirements. *Alabama-Tennessee Natural Gas Co.* v. *Federal Power Commission,* 359 F.2d 318.

The finding made by the commission was a reasonable one and properly supported by the evidence.

Paragraph 7 of the finding states: "The initial year flow-through method should be used in accounting for the investment tax credit, since such procedure does not overstate current operating expenses."

The Revenue Act of 1962, as amended in 1964, provides for an investment credit against federal income taxes equal to 3 percent of a utility's investment in qualified tangible depreciable property during the taxable year. 76 Stat. 963; 78 Stat. 32; Int. Rev. Code of 1954, § 46. The issue created is whether the credit realized in a given year should be flowed through to income in its entirety that same year or spread over the life of the plant involved.

The company has been accounting for this item on the service life flow-through method, which provides for the credit to be retained in a reserve account and flowed through to income over the service life of the property. It characterizes this method of accounting as being in accordance with the intent of Congress, sound accounting practice, and equitable to all generations of customers. It claims that the stated purpose of the legislation was to provide enterprises with capital to increase modernization and to stimulate the growth of the economy.

As to the commission's holding that the company should have used a different method of accounting

which would have flowed the entire credit through to income in the single year when the property was acquired, it is claimed that there was no evidence before the commission to support a finding changing the method of accounting employed. The reason given for this finding, however, is set out in the summary of evidence in the following language: "It is our opinion that, since the investment tax credit represents a reduction of current year income taxes, it should be accounted for on the initial year flow-through basis. We find this method of accounting for the investment tax credit preferable because it recognizes the fact that the credit is 'earned' by making an investment in newly acquired facilities, and such credit is not related to the period when the asset is used. Stated another way, it is our opinion that the proper accounting for the investment tax credit should give cognizance to the fact that this tax credit is a deduction akin to other tax credits, such as the foreign tax credit, gasoline and lubricating oil tax credit, and the deduction allowed for corporation dividends received. Further, the use of the initial year flow-through method of accounting for the investment tax credit for intra-state rate-fixing purposes is consistent with the treatment accorded this item in the setting of rates for other utilities in Connecticut."

At the request of the commission, the company submitted an exhibit which indicated that if the company had been accounting for the investment credit on an initial year flow-through basis since 1962, the net reduction in income expense for the test year ended October 31, 1968, would have been $1,014,000. The pro forma income tax expense was adjusted by this amount. The company claims, however, that this is not based on any evidence or subordinate facts in the record but on a so-called general expertise acquired by the commission through

the performance of its duties over the years and that it deems such knowledge as sufficient to support an order irrespective of a lack of specific evidence. In short, the company says there are no findings in the commission's order to the effect that the company's accounting method was in abuse of discretion or improvident or resulted in unfair or unreasonable costs.

The establishment of public utility rates involves the assessment of all reasonable costs for a public service including taxes. The use of either form of accounting for the determination of investment tax credit has long been a problem with regulatory agencies. Since there is no statutory mandate as to which method is to be employed, the matter is a purely discretionary one to be exercised by the commission. *Alabama-Tennessee Natural Gas Co. v. Federal Power Commission,* 359 F.2d 318. The finding that the "investment tax credit represents a reduction of current year income taxes" and should be treated in the same category as other taxes is based on fact. Whether a deferral of payment would inure more beneficially to the company or to the public was a decision the commission was called upon to make in weighing the entire problem. The claim that managerial discretion or judgment is subordinated to the superior discretion or judgment of the commission does not apply.

The issue was raised and passed on in *Midwestern Gas Transmission Co. v. Federal Power Commission,* 388 F.2d 444, 448, in the following language: "We freely recognize, as does the Commission, that there are many areas and many situations which must remain within the jurisdiction of management. However, it has long been recognized that establishment of public utility charges involves the assessment of costs for a public service. Basic to the

purpose of the Natural Gas Act is a design of regulation concerned with final adoption of rate charges fairly intended to protect the public interest. Necessarily, the area of tax policies embraces managerial decisions directly reflected in the cost of natural gas supplies for the use of the ultimate customer. Here it seems to us quite reasonable and logical to recognize as inherent in the Commission the duty and requirement to exercise its expertise in evaluating the entire tax effect of managerial judgment. If such elected tax policies do not fairly indicate a reasonable and prudent business expense, which the consuming public may reasonably be required to bear, following the required hearing and review procedures, then federal regulatory intervention is required."

That the proper approach to the problem had become difficult of solution was probably the basis for the repeal of this section of the law. By the passage of the Tax Reform Act of 1969, no tax credit under either method can now be taken. 83 Stat. 660 § 703 (a) ; Int. Rev. Code of 1954, § 49.

Paragraph 8 of the finding states: "The use by this Commission, for rate making purposes, of . . . initial year 'flow-through' investment credit is a reasonable exercise of this Commission's authority." The conclusion was one which could reasonably have been reached by the commission. *Colonial Beacon Oil Co.* v. *Zoning Board of Appeals,* 128 Conn. 351.

Objection is taken to the commission's order disallowing as an operating expense $197,000, representing the intrastate portion of the company's charitable contributions. It is claimed that it is extremely important to the company's existence as a service organization that the towns in which it operates have good hospitals, educational institutions and other activities beneficial to the entire

community; that if it did not make charitable contributions it would acquire a bad reputation which might be reflected in its relations with the public and public officials; and that such contributions are a necessary cost of doing business. *Southwestern Bell Telephone Co.* v. *State Corporation Commission*, 192 Kan. 39. The commission did not disapprove of such contributions but believed it was the responsibility of the stockholders and should not be considered as an operating expense.

Charitable contributions are not universally regarded as a deductible expense for rate making purposes. There is a considerable divergence of opinion on this point. Most regard such contributions as an involuntary levy on ratepayers, who, because of the monopolistic nature of utility service, are unable to obtain service from another source and thereby avoid such a levy. Others consider charitable contributions a matter of personal choice and that they should not be hidden in a customer's bill, especially when their beneficial effect may be far removed from his community. *Pacific Telephone & Telegraph Co.* v. *Public Utilities Commission*, 62 Cal. 2d 634, 669. An attempt to have the federal communications commission change the uniform systems of accounts so that all contributions might be charged directly to operating expenses has been refused. *Re Pacific Telephone & Telegraph Co.*, 53 P.U.R.3d 513, 586. The commission has been consistent in ruling on this matter in two previous cases. *Re Hartford Electric Light Co.*, 35 P.U.R.3d 64; *Re Connecticut Water Co.*, 41 P.U.R.3d 152. On this point the court cannot substitute its discretion for that reposed in the commission. There is a sufficient basis in the facts presented to support the conclusion reached. *Colonial Beacon Oil Co.* v. *Zoning Board of Appeals*, 128 Conn. 351, 355; *Andover's Appeal*, 113 Conn. 494.

Paragraph 2 of the finding states: "The company's rate base for the purpose of this proceeding is $609,609,000, overall, of which the intra-state portion is $476,661,000." In view of the above rulings on paragraphs 1, 3 and 4 of the finding of facts, there is insufficient evidence to support this finding.

General Statutes § 16-37 provides in part: "If, upon hearing such appeal, it appears to the court that any testimony has been improperly excluded by the commission or that the facts disclosed by the record are insufficient for the equitable disposition of the appeal, it shall refer the case back to the commission to take such evidence as it may direct and report the same to the court, with the commission's findings of fact and conclusions of law."

The appeal is sustained and the case is remanded to the commission for a further consideration of the matter in accordance with the rulings contained herein on paragraphs 1, 3 and 4 of the finding.