## Connecticut Natural Gas Corporation *v.* Public Utilities Commission

Superior Court      Hartford County      File No. 168988

Memorandum filed December 2, 1971

*Robinson, Robinson & Cole,* of Hartford, for the plaintiff.

*Robert K. Killian,* attorney general, and *Frederick D. Neusner,* assistant attorney general, for the defendant.

## I

SADEN, J. This is an appeal by the plaintiff (hereafter "CNG"), a franchised public service company, from the order and decision of the defendant (hereafter "PUC"), dated November 25, 1970, under its Docket No. 11032. The PUC's decision denied CNG's application for an increase intended to produce $1,925,000 in annual revenue over and above the $3,800,000 requested in an earlier application for increased rates then pending and undecided by the PUC under its Docket No. 10981.

Docket No. 10981 (hereafter "first application") was filed on June 19, 1970. Docket No. 11032 (hereafter "second application") was filed on October 9, 1970, after hearings on the first application had been held on September 8 and 9 and October 5 and 6, 1970, and before a decision had been reached on the first application.

Under the first application CNG sought an annual revenue increase of about 15 percent or approximately $3,800,000, of which amount (a) 35 percent ($1,300,000) was to meet an increase in federal, state and local taxes; (b) 29 percent ($1,100,000) was to pay a projected increase in the cost of gas from CNG's pipeline supplier (Algonquin); (c) 26 percent ($1,000,000) was for higher interest costs; and (d) 10 percent ($400,000) was to cover higher operating costs for increases in wage rates and the cost of materials and supplies. Increases were distributed among ten different classes of services, viz., residential service, nonresidential space heating, general service, air conditioning, school heating service, com-

fort heating and cooling, outdoor lighting, wholesale industrial rate, interruptible service, and seasonal service.

The effective date of the rate increase sought in the first application was July 1, 1970, which was suspended on June 23, 1970, pursuant to General Statutes § 16-19.

The second application, the subject of this appeal and filed October 9, 1970, sought to increase revenue by an additional $1,925,000 over and above the increase of $3,800,000 sought in the first application. This second proposed increase consisted of (a) 36 percent ($700,000) for increased cost of gas from a pipeline supplier of CNG (Tennessee); (b) 31 percent ($600,000) for higher interest costs; (c) 21 percent ($400,000) for higher operating costs, including wage increases and increases in costs of materials and supplies; and (d) 12 percent ($225,000) for an increase in federal, state, and local taxes. The same franchise communities and classes of service were affected by the rate increase, but there was a variance in the impact of the proposals under the two applications upon the amounts to be paid by customers in the various classes of service.

On November 25, 1970, after a fifth day of hearing held on November 3, 1970, in connection with the first application, the PUC denied the second application, granting no portion of the $1,925,000 increase sought over the increase sought in the first application. On November 27, 1970, the PUC denied to CNG the $3,800,000 proposed under its first application but authorized instead that CNG file a schedule of rates designed to produce $2,429,000 in additional annual revenue. On December 2, 1970, CNG duly filed such a schedule which was approved by PUC on December 6, 1970, and became effective on December 11, 1970.

On December 23, 1970, CNG appealed from the PUC order under the second application and it also appealed from the PUC order under its first application. On March 3, 1971, CNG withdrew its appeal from the latter order, leaving only the present appeal to be dealt with, which is PUC Docket No. 11032.

## II

The PUC finding, the paragraphs of which are unnumbered, is based essentially upon two grounds: (1) the failure of CNG to file a proposed amendment of its existing rate schedule as required under General Statutes § 16-19; (2) the failure of CNG to sustain its burden of proof under § 16-22 by reason of its using a "test year" contrary to PUC requirements.

In an appeal of this kind under § 16-37, the court is limited to determining whether the PUC's action is justifiable on the record certified to the court, or whether the PUC has acted illegally and in abuse of its powers. *Brook Ledge, Inc.* v. *Public Utilities Commission*, 145 Conn. 617, 619.

We consider first the finding that CNG failed to file a proposed amendment of its existing rate schedule as required under § 16-19. The filing in question (second application) was by letter of October 9, 1970, in which CNG proposed amended schedules to increase revenues by approximately $1,925,000 "over and above the revenues resulting from the presently proposed rates on file with the Commission." The obvious reference to the "presently proposed rates on file" is the proposed amendment of rates filed on June 19, 1970, being Docket No. 10981 (first application). CNG's transmittal letter made its comparisons of rates in dollars and percentages based upon the previous application rather than upon the rates actually being charged.

The PUC's finding takes the position that § 16-19 does not permit a filing which is a proposal based upon a previous, undecided proposal.

In its allegations on appeal, CNG claims it filed a schedule of proposed rate increases on October 9, 1970, with a proposed effective date of October 20, 1970, that would increase gross operating revenues by $5,725,000 over existent rates and by $1,925,000 over those requested by CNG in an earlier filing then before the PUC and undecided. But the actual filing made by CNG's letter of October 9, 1970, submitted with revised rate schedules, states: "This filing would increase annual revenue by approximately $1,925,000 over and above the revenues resulting from the presently proposed rates on file with the Commission." Obviously, the application in this appeal was not based upon an "existing rate schedule" but rather upon "the presently proposed rates on file with the Commission." In effect, CNG regards its first proposed amendment as an "existing rate schedule" in itself even though it was still pending and under investigation when the second application was filed.

A public utility seeking to increase its rate schedule, under § 16-19, "shall file any proposed amendment of its *existing* rate schedule with the commission" (italics supplied).

CNG's position as alleged in its appeal and as argued in its three briefs is at best ambivalent, but in its last brief it finally concedes that the filing in this case "stood on its own feet and was not an amendment" of the first application. This being so, it must be regarded as not being a proposed amendment of "its existing rate schedule" because unless it is an amendment of its first application, it has no springboard from which to leap. By its own language, the second application seeks an increase over

and above revenues resulting from presently proposed rates on file with the PUC, and in view of the PUC's action in suspending the effective date of the first application pending investigation, those rates were not yet in effect and therefore did not constitute an "existing rate schedule." See Natural Gas Act, 15 U.S.C. § 717c (d) (1970), requiring notice to the federal power commission of a rate change of a rate schedule "then in force," and *Amerada Petroleum Corporation* v. *Federal Power Commission*, 293 F.2d 572, 575, cert. denied, 368 U.S. 976, where the court comments that the federal act requires an application for a rate change to be based upon the "rate . . . in force and effect at the time of the change."

Accepting at face value CNG's position that its second application was not an amendment to a pending amendment, we need not consider whether under § 16-19 such an amendment to a pending amendment is permissible. This in itself, however, is a fatal blow to CNG's appeal because unless the application is regarded as an amendment to its first proposed amendment, it does not have an existing rate schedule as its base. Since it is mandatory under § 16-19 that any new proposed amendment must be of "its existing rate schedule," this is in effect a jurisdictional requirement.

The significance of this requirement is found in the necessity for the PUC to know what rate base is being amended. Until it knows this, its action under § 16-19 would be speculative. Moreover, the public, particularly the lay public, and the municipalities involved have critical and substantial interests in knowing and understanding with certainty what the proposed amended rate schedule contemplates. It should be clearly and simply laid out, and it must use existing rate schedules as a base.

CNG argues that there is no reason why it cannot file a second application during the 150-day suspension period while the first application is still pending and undecided. It claims that § 16-19 as amended does not prohibit such a second filing, and that unless CNG is allowed to follow this procedure, the PUC can effectively prevent a second filing indefinitely "or forever," including the time that could be lost even after a PUC order is entered during the period an appeal to the courts is being litigated.

We have already pointed out that § 16-19 as amended requires the proposed amendment of rates to be to CNG's "existing rate schedule," and that if, as CNG asserts, the application here on appeal stands "on its own feet and not as an amendment" of the first application, it can only do so if the rates sought in the pending and undecided first application can be considered to be "its existing rate schedule."

Under § 16-19, as amended, a proposed amendment becomes effective at the time fixed in it unless the PUC orders a suspension as was done with CNG's first application. Once the suspension was ordered, that proposed amendment could not be classified as CNG's "existing rate schedule" and a second application, as here involved, standing "on its own feet" cannot be said to be applicable to an existing rate schedule which takes the form of a pending and undecided previous application then under suspension.

Lengthy arguments of policy are made by CNG and PUC pro and con the permissibility of a second filing such as here at issue while a first filing still remains undetermined. The present law has been in effect substantially in its present form since 1935 (see *New Haven* v. *New Haven Water Co.*, 132 Conn. 496, 508) and in a period of some thirty-six years no

case in Connecticut has been brought to the court's attention where a second filing has been made by any public utility or allowed by the PUC while a first filing was under suspension, pending and undecided. This fact alone of course would not be conclusive on the issue here involved, but it is some indication of the practical interpretation given to § 16-19 as amended by the PUC and the regulated utilities subject to its provisions. See *Savings Bank of Rockville* v. *Wilcox,* 117 Conn. 188, 195; *Cedar Island Improvement Assn.* v. *Clinton Electric Light & Power Co.,* 142 Conn. 359, 369.

The facts of this appeal do not precisely present the issue finally argued by CNG in light of its admission that its second filing stands independently of its first filing because its application does not purport to seek an increase of $1,925,000 over and above its existing rate schedule (which would be that in existence prior to the time of its first filing) but over and above the amount of increase already sought in its first application. As already shown, the first application did not in itself constitute the "existing rate schedule" at the time of the second filing.

But even if the precise issue were before the court on this appeal, and we were confronted with two successive applications, each based upon the true existing rate schedule as contemplated by § 16-19 as amended the first of which was under suspension, pending and undecided at the time of filing the second application, the question of public policy involved is one that might more properly be better debated in the legislative rather than the legal forum. There are factors on both sides of the fence which deserve consideration. As it presently stands, in face of the long history of § 16-19 and its administration by the PUC, plus other factors of public policy that appear to the court, a construction of the

statute which would allow endless successive applications heaped one upon another could well lead to a chaotic administration of public utilities that would be seriously detrimental to the public interest. Legal authority on this matter is conspicuous for its paucity, but this view has been discussed in *Logan Gas Co.* v. *Public Utilities Commission,* 115 Ohio St. 107, 117, as follows: "There are arguments of policy in favor of this holding [striking a new rate schedule]. If the utility can file a schedule No. 8 during the pendency of a hearing upon schedule No. 7, it can successively file schedules 9, 10 and 11 during the pendency of such hearing. If it can prepare one new schedule before the hearing upon the first one under investigation is completed, it can prepare several. Moreover, the cities which did not protest the first rates, and have protested the second rates, could not be bound by the testimony used in the first hearing. It may be questioned whether the commission could consolidate the separate proceedings upon the separate schedules. If it could not, the filing of successive schedules under the circumstances set forth herein, would lead to endless administrative confusion." See also *Pittsburgh* v. *Pennsylvania Public Utility Commission,* 171 Pa. Super. 391, 394; *North Carolina Utilities Commission* v. *Atlantic Coast Line R. Co.,* 224 N.C. 283, 288.

We do not of course agree with CNG's argument that PUC can, under § 16-19, delay "forever" a decision on a proposed amendment. Once the proposed amendment is made and the suspension period, if invoked, has expired, an "existing rate schedule" has come into being upon which further proposed amendments can be based. If the remedy of mandamus were ever necessary to force a decision, after the lapse of a reasonable time, it could be sought; and if also necessary, the provisions of § 16-39 dealing with a stay or supersedeas of any order on appeal

could be invoked to allow the company to apply whatever rates have been approved by the PUC without waiving the right of appeal.

CNG complains of the time lag occasioned by the 150-day suspension period which is usually invoked by the PUC on rate increase amendments. It also complains of the entire appellate process and its effects upon successive applications for rate increases. This regulatory and appellate procedure has in most instances operated reasonably well for many years. To ask the court at this point of time in effect to undertake what would amount to a substantial reshaping of these procedures is unreasonable. If as CNG seems to claim there is very little that is right with them, then its best means of redress is with the legislature where radical legal surgery can be best accomplished, if public policy dictates it. There are many policy decisions to be made over a broad spectrum of subjects, both legal and practical, which a court should be chary of making on the basis of the facts presented by an appeal such as this. Furthermore, we do not express any opinion as to whether the pendency of an appeal, if the supersedeas imposed by § 16-39 is counterordered by the court, would necessarily destroy the "effective" date of a PUC order lowering the amount of increases requested by a utility; nor do we pass upon whether the continuing investigation of the PUC after the suspension period has expired affects the "effective" date of the proposed increase under § 16-19.

Perhaps the legislature may or may not in its wisdom see fit to make some changes in the law that would permit successive filings under closely controlled conditions subject to prior approval of the PUC while previous filings are pending and unresolved. See, for example, 18 C.F.R. § 154.66 (b) (federal power commission regulation under the Natural Gas Act).

## III

The PUC's rejection of the second application which is the subject of this appeal has been sustained for the reasons already enunciated. Its finding nevertheless proceeds to state that CNG has failed to sustain its burden of proof under § 16-22 because it did not present evidence based on "test year" requirements consistently followed by the PUC. We do not regard this further finding as a waiver of the PUC's position with reference to CNG's failure to use "its existing rate schedule" under § 16-19 because the language of § 16-19 makes the "existing rate schedule" a jurisdictional factor which could not be waived by the PUC, even if it intended to do so, which it clearly did not in this case.

In view of what has already been decided in Section II of this memorandum, it is an act of supererogation for the court to proceed further. But in the interests of pointing out certain things as a possible guide in the form and substance of the PUC's orders, some comment appears desirable.

The PUC defines "test year" in its finding essentially as "the use of actual figures for the most recent 12-month period available adjusted to reflect all known changes in operations." It points out that CNG used a test year of the twelve months ending June 30, 1970, adjusted for changes known and measurable through eight and one-half months in advance.

The PUC objects to this test year as not being the most recent twelve-month period available, and states that CNG "wishes the Commission to deal in mere speculation in many respects, rather than actual figures adjusted for known changes."

The test year is an important tool to be used in reaching a decision on a fair rate. It is employed to

show what the probable financial situation of the utility will be in the immediate future, and hence it must be representative of conditions which will probably prevail in the immediate future when the rates will be effective. *Southern New England Telephone Co.* v. *Public Utilities Commission,* 29 Conn. Sup. 253, 258. It must be based on the most recent actual experience of the utility with adjustments made for known changes affecting costs and revenues in the immediate future which are not conjectural, and which are not so remote in time that they may destroy the representative character of the test year.

The PUC rejected a test year ending June 30, 1970, because it was not the most recent twelvemonth period available. It states in its finding that CNG relied upon the same test year as it did in its first application, viz., a test year ending June 30, 1970, adjusted for changes known and measurable through December 31, 1970, which the PUC points out it had already rejected in the hearing on the first application. Merely stating in its finding that CNG failed to sustain its burden of proof on the matter of the test year is acceptable as far as it goes, but the finding must spell out in what specific respects the burden of proof was not fulfilled. *Wilson Point Property Owners Assn.* v. *Connecticut Light & Power Co.,* 145 Conn. 243, 252.

The test year is only useful insofar as it affords a solid base for gauging the immediate future. If it is reasonably close in time to the filing date of the application for increase, it should normally suffice in the absence of countervailing facts and circumstances. That a company should be permitted to adjust the test year forward for a reasonable period of time where definitely ascertainable expenses are involved during such future period is a matter not seriously open to challenge. The mere

fact that proposed adjustments are made up to eight and one-half months beyond June 30, 1970, would not in and of itself alone be improper if these adjustments involved definite, ascertainable expenses maturing or certain to materialize during that period of time. Such expenses of course must not be based upon speculation or contingencies that are likely, but not certain, to occur and must bear a realistic, relevant relationship to the effective date of the proposed rate increase so that the company will not be collecting higher rates in advance of the incidence of the expenses in question. Cf. *Southern New England Telephone Co.* v. *Public Utilities Commission,* 29 Conn. Sup. 253, 258.

The PUC finding that the proposed adjustments up to eight and one-half months beyond the end of the test year are improper lacks specificity on its face. It may well be true that such a period here or in a given case may be an excessive amount of the time, but the PUC's finding must do more than merely state that as a conclusion of law. If the length of such a period promotes speculation and lacks hard facts to justify itself, the PUC's finding should spell out the vital details to buttress its conclusions of law.

This seems to have been done in the briefs filed by the PUC's counsel, but unfortunately briefs are not a substitute for the order and finding of the PUC itself. The PUC order and finding is the sole key to the case and must be self-sufficient.

## IV

(1) We must keep in mind that the only matter before the court on an appeal of this nature is the record and the order and finding as of the date they were entered. The court is not permitted to indulge in the hindsight suggested in parts of CNG's three briefs. The order and finding must be tested on the

evidence before the PUC. Therefore it is not helpful to analogize, for example, in the first CNG application the Algonquin Gas Transmission cost increase whose suspension by the federal power commission expired on November 1, 1970 (at which time a definite and lower rate was ordered than was originally sought by CNG) with the Tennessee Gas Pipeline increase here involved which was under federal suspension at least until March 17, 1971, long after the order and finding in this case. The amount of the Algonquin increase was a known and definitely ascertainable expense on November 27, 1970, the date of the PUC order on CNG's first application; the Tennessee Gas increase was not in the same category when the order in this case was entered. The fact that the PUC took cognizance of the Algonquin increase on the first application and not of the Tennessee increase here involved can be easily justified because the PUC was dealing with a bird of a different feather.

Except for the omission by the PUC to spell out such facts in its order and finding, its legal conclusion with reference to the Tennessee increase could not be upset on appeal.

(2) CNG's position with reference to an increase of $600,000 as the higher cost of money to finance the company's service to its customers is ambiguous. While it claims that testimony of one Frauenhofer establishes the basis for this portion of the increase, it appears that with reference to the first application Frauenhofer testified about a 9½ percent rate of interest on CNG's bond application for $12,000,000 long-term bonds to replace short-term borrowings whereas the application for permission to issue bonds before the PUC but not yet acted upon at the time of this PUC order, as far as the court can determine, shows a 9 percent interest figure. Furthermore, in its first application for a rate increase,

not involved in this appeal but decided by the PUC on an order issued within two days of the order in the present appeal, CNG sought a 10½ percent interest figure on the same bonds. The PUC in its order on the first application decreased CNG's pro forma interest expense by $696,000. This sum was calculated by eliminating $1,254,721 proposed bond interest and substituting interest at the rate of 8 percent on $7,050,000 short-term notes payable outstanding as of June 30, 1970, the test year.

In addition, CNG's first brief failed entirely to question the disallowance of the $600,000 item of interest and it would appear therefore to have abandoned this item as a claim which had, in any event, already been passed upon by the PUC in its order on CNG's first application. It is true, however, that CNG in its second brief sought to resurrect this point by reference to Frauenhofer's testimony on the first application referred to above. There are, however, several discrepancies to which we have already adverted, and other factors, which could justify the PUC's order in the instant case, except for the PUC's failure to spell out the facts upon which it found that CNG had not sustained its burden of proof as a matter of law.

(3) The item of $400,000 related to higher wage rates, materials and supplies is clearly not established by sufficient evidence to warrant a reversal of the PUC order, except, of course, for the PUC's failure to set forth sufficient facts in its finding to justify the order. For example, aside from bald statements by a senior vice president who testified that $90,364 would be payroll cost adjustments at year end for employees in the amounts claimed, there was no supporting evidence. No objective or measurable criteria were adduced to document the nature, terms and conditions of the salary increase program at any point of time up to the end of 1970.

There is no sacrosanctity about the testimony of any company officer regardless of his position which gives such testimony any godlike fiat that must be accepted out of hand by the PUC. The CNG had the burden of proving not only the amount of these operating costs and other expenses but also the basis for the charges to its expense accounts and the propriety of including such charges for rate-making purposes. *Public Service Coordinated Transport* v. *State,* 5 N.J. 196, 222.

The same is true of the postal increase of $24,000 sought by CNG. Not only was the effective date of the two-cent increase uncertain at the time of the hearing and not then definitely ascertainable but there was also no evidence to support the claim that 1,200,000 pieces were mailed annually. Bald statements need to be covered with some evidential hair in this situation to be judicially acceptable.

For the above reasons, *Southern New England Telephone Co.* v. *Public Utilities Commission,* 29 Conn. Sup. 253, 258, is distinguishable.

(4) As to federal, state, and local taxes, the claimed increase is $225,000, and the same principles set forth above in (3) apply with reference to the claims for increases in social security and federal unemployment taxes. No supporting evidence was supplied to establish the payroll total to which the taxes would apply, and reference to testimony in the first application only served to confuse because it is not certain whether the payroll in question in the first application was that as of June 30, 1970, or that as of December 31, 1970. Additional clarifying data should have been supplied by CNG.

In addition the effective date of increase was not established in evidence.

As for the state gross revenue tax increase of $36,557, while this item seems to have been properly

adjusted, it uses a figure of 4 percent of the proposed increases in its rate of return which the evidence does not establish. CNG had the burden of proving the component items making up the increased expenses which would be subject to tax, such as gas purchased and produced, other operating and maintenance expenses, and taxes other than state and federal income taxes. The difficulty, therefore, is with the validity of the component items all of which were in dispute and were colored by the presence of the first application upon whose figures the second application is relying in whole or in part to reach sums submitted in the instant case as proper increases.

## V

CNG's first application was granted in part by PUC on November 27, 1970, in the sum of $2,429,000. Its second application, the subject of this appeal, was denied totally on November 25, 1970. The first application had been filed on June 19, 1970, and the present application on October 9, 1970, after several hearings on the first application had already been held.

CNG took an appeal from the orders in both cases and then withdrew its appeal on the first application on March 3, 1971. Both parties have argued at length the issue of what is an "existing rate schedule." CNG's position basically is that the filing of the proposed increase ipso facto creates an existing rate schedule as of the effective date set in the proposal notwithstanding the right of the PUC to suspend its effective date. The PUC's position is that no proposed increase becomes an existing rate schedule if suspension is invoked, as here, at least as long as the suspension is in effect and possibly until the entire pending appellate process has finally been exhausted. As already indicated, we are not required under the facts and immediate issues as we

see them to pass upon all the legal ramifications of this argument beyond commenting that there may be room for legislative and regulatory action to clarify and tighten some of the procedures involved in rate cases in order to assure reasonably prompt determination of issues not only for the company but also for customers. This could mean providing for prompt correction of rates both upwards and downwards on perhaps an annual basis.

Although CNG's sole concern is the increase of its rates, it is quite obvious that even the best-considered PUC order may produce more money and a higher rate of return than was originally contemplated, and if it does, there should be an automatic refunding procedure to those customers who paid the overcharge. Without such a refunding procedure, a company is more likely to seek greater increases than it needs in the hope that the reductions ultimately ordered by the PUC will still produce an excess that will ultimately stay with the company. If the company knows this will not happen, because of automatic refunding, it is more likely to seek realistic increases drained of the excess water frequently pumped into them for the reason indicated.

Since CNG does not consider the second application an amendment of its first application (assuming such an amendment is permissible), we are not obliged to consider this appeal as involving the first application. The appeal taken from the first application was withdrawn on March 3, 1971, and the rate thus set by the PUC order on that application is beyond attack in the present appeal. Much of the thrust of CNG's appeal in this case is a belated attempt to accomplish in the present appeal what it never intended or set out originally to accomplish in its treatment of both of these applications. CNG's

effort to explain the withdrawal of its appeal on the first application as having been done "out of an excess of caution and (having) resulted from direct intimidation" is a little hard to swallow. CNG is trying to take two bites out of the second apple on the apparent erroneous assumption that it never got a bite out of the first apple. We do not agree. The fact of the matter is that it did get its bite out of the first apple but for reasons of its own decided to discard it.

## VI

Although in many respects the PUC order and finding are deficient for reasons set forth above, and normally would have been remanded, on the main jurisdictional issue under § 16-19 as amended, the order and finding are adequate to meet the requirements of the law. For this reason it would serve no useful purpose to remand the case to the PUC for further findings.

The appeal is therefore dismissed.